## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ROBERT W. WINKEL,

          Petitioner,

v.

                                           Case No. 14-CV-3214-JTM

JAMES HEIMGARTNER,

          Respondent.


### MEMORANDUM AND ORDER ON REMAND


By an order dated April 15, 2016, the Tenth Circuit Court of Appeals reversed this court's dismissal of Robert Winkel's federal habeas petition based on procedural default. Dkt. 24. On remand, the court reevaluates Winkel's petition. Because none of Winkel's assignment of errors entitles him to habeas relief, the court finds that the petition should be denied on the merits.

### I.      Factual Background and Procedural History

The Kansas Court of Appeals ("KCOA") summarized the facts as follows in *State v. Winkel*, 322 P.3d 1026, *1 (Kan. Ct. App. 2014):[1]

> On December 30, 2010, Robert Winkel asked Dena Gartleman, his step-sister, for a ride from Kingman to Anthony and requested she go by his home in Cleveland to pick up some of his things. When the two of them arrived at his house in Cleveland, he took the keys out of the ignition and took her purse, telling her he did not want her to leave. She followed him inside to get her keys and purse back.
>
> Gartleman was able to get her keys and tried to go back home to Kingman, but Winkel put the car in park and the two struggled. Winkel obtained control of the keys, grabbed Gartleman by the throat, and threw her into the back seat. When she tried to leave the car, Winkel pulled her back in, choked her, and head-butted

---

[1] State court factual findings are presumptively correct and may be rebutted only by "clear and convincing evidence." *Saiz v. Ortiz*, 392 F.3d 1166, 1175 (10th Cir. 2004) (citing 28 U.S.C. § 2254(e)(1)).

her. She testified that once Winkel head-butted her, she became "frightened of [Winkel's] irrational behavior" and "couldn't believe" he had hurt her after taking her keys. Gartleman ultimately required stitches on her nose.

On the way to Anthony, Winkel was driving Gartleman's car without her permission and damaged the car stereo and the steering wheel with his fist. Gartleman repeatedly asked to be let go, but Winkel would not let her out of the car. He drove around for a couple of hours. Winkel finally took Gartleman to their mother's house in Anthony where she contacted law enforcement and called an ambulance to go to the hospital.

Winkel was arrested and charged with one count each of aggravated kidnapping, aggravated battery, criminal damage to property, and criminal deprivation of property. . . .

Prior to arraignment, Winkel's court-appointed attorney, Michael Brown, requested a competency evaluation because Winkel refused to discuss the case with him. Dkt. 1, Feb. 4, 2011 Hearing Tr. at 2. The district court granted the request and referred Winkel to the local Horizons Mental Health Center for an evaluation. *Id.*, Ex. F, Feb. 4, 2011 Hrg. Tr. On February 9, 2011, Sean Wagner, a licensed clinical psychotherapist, assessed Winkel as incompetent to stand trial. *Id.*, Ex. G, Competency Evaluation Report dated Feb. 9, 2011. On February 23, 2011, the district court followed Wagner's recommendation, found Winkel incompetent to stand trial, and referred Winkel to Larned State Hospital for further evaluation and treatment. *Id.*, Ex. H, Feb. 23, 2011 Hrg. Tr. at 4. During his stay at Larned, Winkel's doctors prescribed him injectable psychiatric medication after he refused to take them orally. *Id.*, Ex. I, Forensic Evaluation Report dated June 22, 2011 at 4.

On June 22, 2011, Larned reported that Winkel was now competent to stand trial. *Id.* at 8. The report cautioned "if [Winkel] does not continue to take his psychiatric medication as prescribed he would likely experience a decompensation of his mental health and exacerbation of his psychotic symptoms." *Id.* Upon receipt of this report, the trial court presumably found Winkel competent to stand trial and returned him to the county jail to await trial.

After a week or two at the jail, Winkel began refusing to take his psychiatric medication. *Id.*, Ex. L, Jan. 19, 2012 Hrg. Tr. at 23. Winkel also continued to refuse to consult with Brown regarding his case. As a result, Brown filed a second request for competency. *Id.*, Ex. J, Oct. 7, 2011 Hrg. Tr. at 2. Winkel did not agree to a competency evaluation, but asked that any evaluation be completed by someone other than Wagner, due to their history during their teens. The court accommodated Winkel's request and ordered a competency evaluation by Horizons Mental Health Center in Hutchinson. *Id.* at 9. Dr. Dale Anderson, a clinical psychologist, conducted an evaluation on November 1, 2011. He concluded that Winkel was competent to stand trial. *Id.*, Ex. L, Jan. 19, 2012 Hrg. Tr. at 3, 14.

On January 19, 2012, after an evidentiary hearing, the trial court found Winkel competent to stand trial. *Id.* at 33. According to Dr. Anderson's testimony, Winkel made an intelligent business decision not to answer his attorney's questions about the case. *Id.* at 14. The court noted that even though Winkel had a mental illness (Schizophrenia, Paranoid Type), it was not that Winkel was unable to aid in his defense but that he was unwilling to do so. The trial court then scheduled Winkel for arraignment.

On February 3, 2012, Winkel pled not guilty after formal arraignment. *Id.*, Ex. M, Feb. 3, 2012 Hrg. Tr. at 5. He also told the court, for the first time, that he wanted to represent himself and fire Brown as his attorney. *Id.* at 6. After explaining the dangers of self-representation and that the court would hold Winkel to all rules and procedures, the trial court found Winkel understood his right to counsel and knowingly, intelligently, and voluntarily waived it. *Id.* at 38. The court discharged Brown as primary counsel, but appointed him as stand-by counsel to answer any reasonable questions Winkel may have at trial.

Winkel's jury trial began on April 9, 2012. He called six witnesses to testify on his behalf. He also took the stand and testified that:

• He had permission to drive Gartleman's car;
• She was asleep in the back seat due to her diabetes;
• She had blood on her face when she climbed up into the front seat;
• He believed she injured herself; and
• Her motive for injuring herself and blaming him was that he damaged the roof of her shed and that "over the past 15 years, . . . there's been a lot of stuff."

*Winkel*, 322 P.2d at *1. During the trial, Winkel attempted to admit an EMS report into evidence. The State objected, and the trial court denied the report's admission as hearsay because no EMS personnel were present at trial. Winkel stated that he did not have any EMS personnel subpoenaed because he knew Dr. Earl George, the emergency room physician who treated Gartleman, would be present and thought he could use him to admit it. *Id.*; Dkt. 1, April 9, 2012 Trial Tr. at 24:10-13 ("I was going to [subpoena EMS people], but then I figured I didn't need to since [Dr. George] was going to be here.").

A jury found Winkel guilty on all four counts. Winkel timely appealed, alleging three assignments of error: 1) insufficient evidence to support his conviction for aggravated kidnapping, 2) denial of his right to present his theory of defense, and 3) violation of his right to a speedy trial. *Winkel*, 322 P.2d at *2. The KCOA affirmed his conviction.

On May 9, 2014, petitioner gave prison authorities a petition for review to mail to the Kansas Supreme Court ("KSC"). On May 13, 2014, even though the petition for review contained a timely postmark of May 12, 2014, the KSC returned the petition to Winkel, stating it could not be filed because it was received one day late and was not accompanied by the requisite number of copies.

On November 14, 2014, petitioner filed a federal habeas corpus petition, alleging nine grounds for relief: 1) deprivation of his constitutional guarantee to conflict-free counsel, 2) abuse

4

of discretion by trial judge in finding petitioner incompetent to stand trial, 3) failure of trial judge to inquire and disqualify the court appointed lawyer for conflict of interest, 4) violation of his right to refuse anti-psychotic drugs, 5) jail harassment, 6) lack of access to legal research, 7) compulsory process, 8) deprivation of his right to present evidence establishing reasonable doubt, and 9) insufficient evidence to support his conviction of aggravated kidnapping as a matter of law and common sense. On August 31, 2015, this court dismissed Winkel's petition, finding his claims were procedurally defaulted because the KSC rejected his petition for review on procedural grounds. This court also denied Winkel's post-judgment motions. Winkel appealed these decisions.

On April 15, 2016, the Tenth Circuit reversed this court's dismissal of Winkel's federal habeas petition and remanded the matter with instructions for this court to reevaluate the potential procedural bars under the correct governing standards. The Tenth Circuit concluded that this court erroneously resolved disputed facts against Winkel and applied incorrect legal rules in deciding whether his state law filing complied with the state prison mailbox rule. *Id.* at 6. The Tenth Circuit also found that this court failed to consider whether the state court's rejection of his pleading as untimely was based on an adequate state procedural ground and whether the ten-copy rule constitutes a jurisdictional prerequisite. *Id.* at 7-8.

## II.    Substance Over Form

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs the court's review of a federal habeas petition. 28 U.S.C. § 2254. Subsection (b)(2) states that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." Under this subsection, where a court is convinced that a claim is easily resolvable against the petitioner, the

court may reach the merits of the claim, rather than dismiss the petition. *Granberry v. Greer*, 481 U.S. 129 (1987); *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997). *See also* Rule 4 of Rules Governing Section 2254 in the United States District Courts (court may sua sponte dismiss a petition without ordering a responsive pleading "[i]f it plainly appears petition is not entitled to relief . . ."). Because the court is convinced that all of Winkel's claims lack merit, the court will address his claims on the merits instead of expending more time on the procedural issues.

## III.    Merits Analysis

### A.  Right to Conflict-Free Counsel (Grounds 1 and 3)

In Ground 1, Winkel claims that his court-appointed attorney Brown had a conflict of interest. In support of this claim, Winkel alleges that Brown conspired with the prosecution to delay his trial by requesting a competency hearing and committing him to a "nut-house." Dkt. 1, Habeas Petition at 8, 11. Winkel alleges that all of this was done to force him to relinquish his right to remain silent in violation of his rights under the Fifth and Sixth Amendments. In Ground 3, Winkel claims that the trial judge failed to ensure he had the assistance of conflict-free counsel, which requires automatic reversal of his conviction, citing *Holloway v. Arkansas*, 435 U.S. 475 (1978). Dkt. 1, Habeas Petition at 13.

Winkel correctly notes that the Sixth Amendment grants him the right to conflict-free representation. *Holloway*, however, is inapposite because the conflict there involved multiple concurrent representation (*i.e.*, counsel represented three codefendants at the same time). Here, the alleged conflict is a disagreement between counsel and his client regarding the client's competency. Brown requested a competency evaluation because Winkel refused to discuss the charges with counsel and to assist in his own defense. Dkt. 1, Feb. 4, 2011 Hearing Tr. at 2. Winkel maintained that he had a right to remain silent and simply did not trust Brown.

In order to establish an actual conflict of interest triggering a presumption of prejudice, petitioner must demonstrate that counsel actively represented conflicting interests, and that the actual conflict of interest adversely affected counsel's performance. *Cuyler v. Sullivan*, 446 U.S. 335 (1980). "An actual conflict of interest exists only if counsel was forced to make choices advancing interests to the detriment of his client." *Workman v. Mullin*, 342 F.3d 1100, 1107 (10th Cir. 2003) (quotation marks and ellipsis omitted). Considering the Constitution's prohibition against trying defendants who are mentally incompetent and the seriousness of the charges Winkel faced, the court finds that appointed counsel did not advance an interest detrimental to Winkel. Although the competency requests were against Winkel's wishes, that does not mean it was to his detriment. When a lawyer has reason to believe that his client may not be mentally competent to stand trial, he does not render ineffective assistance of counsel by making his concerns known to the court. *United States v. Boigegrain*, 155 F.3d 1181, 1190 (10th Cir. 1998) (holding that a lawyer with a reasonable doubt regarding the competency of his client to stand trial does not render ineffective assistance of counsel by raising the competency issue against the wishes of his client); *Bundy v. Dugger*, 816 F.2d 564, 566 n. 2 (11th Cir. 1987) ("If defense counsel suspects that the defendant is unable to consult with him with a reasonable degree of rational understanding, he cannot blindly accept his client's demand that his competency not be challenged.") (citation and quotation marks omitted). Winkel's extensive history of mental illness, his paranoid schizophrenia, his refusal to take prescribed psychiatric medication, and his decision not to consult with appointed counsel placed Brown in an untenable position. Under these circumstances, Brown did not have conflict of interest. Thus, Winkel's conflict of interest claim (Ground 1) lacks merit.

As to Winkel's claim that the trial court failed to make a proper inquiry regarding the conflict, the record plainly does not support this claim. Contrary to Winkel's assertions, he did not specifically raise the conflict issue at the competency hearings. *See* Dkt. 1, Ex. F, Feb. 4, 2011 Hrg. Tr.; Ex. H, Feb. 23, 2011 Hrg. Tr.; Ex. J., Oct. 7, 2011 Hrg. Tr.; Ex. K, Dec. 2, 2011 Hrg. Tr.; Ex. L, Jan. 19, 2012 Hrg. Tr. He complained that Brown did not provide him with materials as promised, but did not attempt to fire his counsel, seek appointment of new counsel, or ask to represent himself at any of those hearings.[2] Winkel first advised the trial court that he wanted to represent himself and discharge Brown at his arraignment. After completing the docket, the trial court conducted an inquiry:

> The Court: . . . when we were here for your competency hearing Mr. Brown indicated, and you indicated, that you were choosing not to disclose what happened or your various defenses to Mr. Brown to enable him to assist you at trial. Is this something personal towards Mr. Brown or is it just that you think you could do a better job of representing yourself than an attorney can?

> The Defendant:      It's not the latter. It's – for one, I don't really trust anybody, especially when it concerns my life. Two, his reaction to when I first seen him indicated that I can't really trust him. And I haven't, and throughout the course of his representations to me, I haven't been able to obtain everything that I have requested. And the things I have obtained that I requested took a very, very long time to get to me.

Dkt. 1, Ex. M, Feb. 3, 2012 Hrg. Tr. at 14-15. The trial court also explored whether or not to appoint another attorney to represent Winkel given his paranoia diagnosis:

> The Court:  Okay. And so do you think that if another attorney were appointed to represent you, you would have a better relationship or trust with them?

> The Defendant:  It depends on the experience that I get with him as an individual.

*Id.* at 16:13-18.

---

[2] Winkel did make a remark that indicated he wanted different counsel, but he did not pursue it to avoid further delays. Ex. J., Oct. 7, 2011 Hrg. Tr. at 7 ("I would ask for different legal counsel, but I don't want it to continue to drag on further.")

After hearing Winkel's arguments, the trial court asked appointed counsel to respond. Brown reported that he had filed a standard motion for discovery and motion in limine, and that he had provided Winkel copies of all discovery he had received, as well as the transcript of the preliminary hearing. In response to the court's inquiry regarding appointing another attorney as primary or stand-by counsel, Brown stated:

> I don't know if it's a personality conflict. I know Robert hasn't been taking his medication since, I believe, July 13th or 17th, somewhere in there. I don't know what effect that has on his decision. And it's – who's to say that a new face will walk in and all of a sudden he opens up and tells the guy what happened and what he wants to testify to. I mean, that's a possibility. But, it's a remote possibility.

*Id*. at 23-24.

The trial judge granted Winkel's request to represent himself, but appointed Brown as stand-by counsel. By doing the latter, the trial judge implicitly found that Brown had no conflict of interest and that he had provided effective representation to date. The hearing transcripts show that the trial judge took great pains ensuring Winkel's constitutional rights were protected. Thus, Ground 3 lacks factual support, rendering it meritless.

## B. Competency and Speedy Trial (Ground 2)

Ground 2 alleges that the trial court violated Winkel's right to a speedy trial under the Sixth Amendment when it found him incompetent to stand trial. Winkel complains that the finding was based solely on his decision to exercise his right to remain silent by refusing to disclose details regarding the incident to appointed counsel or the therapist evaluating his competency. The record, however, does not support this claim.

Contrary to Winkel's assertions, his invocation of the right to remain silent was not the sole basis for finding him incompetent. The trial court relied upon a competency evaluation report submitted by Sean Wagner, a licensed clinical psychotherapist, who opined that Winkel

was incompetent to stand trial because he could not adequately participate in the legal proceedings against him. Dkt 1, Competency Evaluation Report dated Feb. 9, 2011. Wagner reached this conclusion after interviewing Winkel, consulting with Brown, and reviewing Winkel's extensive past psychological records. In Wagner's opinion, Winkel's ability to work effectively with his attorney to plan legal strategy and to testify was impaired due to Winkel's unwillingness to disclose details. *Id.* While Winkel's silence was a major factor, Wagner also considered Winkel's intelligence and past psychological records.

Even if the trial court's incompetency finding was based solely on Winkel's silence, the right to remain silent relates to using his silence against him to establish guilt for the offenses charged. Winkel cites no authority, and the court has found none, that says his silence cannot be used to determine his competency to stand trial. *Tally v. Ortiz*, 252 F. App'x 248, 255 (10th Cir. 2007) (a defendant's right against self-incrimination is not implicated when testimony is admitted only for the purpose of establishing defendant's sanity). Thus, Ground 2 provides no basis for federal habeas relief.

### C.  Right to Refuse Antipsychotic Drugs (Grounds 4 and 5)

Grounds 4 and 5 relate to a pretrial detainee's right against involuntary medication. Ground 4 alleges that Winkel's rights were violated when Larned State Hospital employees restrained him and injected him with "antipsychotic dope" against his will without a "Sell hearing." Dkt. 1, Habeas Petition at 14. Ground 5 alleges that jail staff harassed Winkel every night for five months to take unwanted medicine. *Id.* at 15-16. Neither constitutes a cognizable federal habeas claim.

"It is well settled that an individual has a significant constitutionally protected liberty interest in avoiding the unwanted administration of antipsychotic drugs.'" *United States v.*

*Chavez*, 734 F.3d 1247, 1249 (10th Cir. 2013) (*quoting Sell v. United States*, 539 U.S. 160, 178 (2003)). In *Sell*, the Supreme Court held that the government may involuntarily administer drugs to a mentally ill, non-dangerous defendant in order to render him competent to stand trial only upon a four-part showing. The government must establish that: 1) "important governmental interests are at stake;" 2) the "involuntary medication will significantly further" those interests; 3) the "involuntary medication is necessary to further those interests," e.g., less intrusive alternative treatments are unlikely to be effective; and 4) the administration of the medication is "medically appropriate " and in the defendant's best medical interests. *Id.* at 180-81.

Winkel's reliance upon *Sell* is misplaced. *Sell* is inapposite as it involved a state forcibly administering antipsychotic drugs to a criminal defendant during trial in order to maintain his competentcy to stand trial. Here, the state did not involuntarily medicate Winkel in order for him to stand trial. Months prior to the trial, the court had found Winkel competent to stand trial even though he had been refusing to take his psychiatric medication. By the time the trial started, Winkel had been off his psychiatric medication for at least five months. The involuntary administration of medication occurred while Winkel was committed at Larned, more than eight months prior to trial.[3] Jail staff testified that within a week or two after Winkel returned from Larned, he started refusing his medication. Dkt. 1, Ex. L, Jan. 19, 2012 Hrg. Tr. at 23. Given the temporal remoteness of the alleged forcible administration of psychiatric medication, there is no indication that it had an effect on the trial. Indeed, Winkel has not alleged any trial prejudice based on the forcible administration of psychiatric medication other than undue delay. Because Grounds 4 and 5 are unrelated to his conviction, they provide no basis for habeas relief. If

---

[3] Larned discharged Winkel to the state court on July 11, 2011. *Winkel v. Hammond*, Case No. 13-3103, Dkt. 1-1, Written Notice to the Court of Change of Status. The jury trial began on April 9, 2012.

anything, Ground 4 may be a § 1983, which Winkel has filed against several Larned doctors. *Winkel v. Hammond*, Case No. 13-3103-SAC (D. Kan.). That action is pending.

### D.  Denied Access to Court (Ground 6)

In Ground 6, Winkel alleges that his right to court access was violated because the trial judge allowed him only five (5) hours per week at the law library. Pretrial detainees, however, do not have a clearly established right under federal law to access a law library as required for federal habeas relief. *Kane v. Garcia Espitia*, 546 U.S. 9, 10 (2005) (per curium). Thus, Ground 6 is not a cognizable federal habeas claim.

### E.  Compulsory Process (Ground 7)

In Ground 7, Winkel claims that his right to compulsory process was denied because "neither lawyer nor sheriff would assist him in finding [witnesses to testify on his behalf.]" Dkt. 1, Habeas Petition at 18. The Compulsory Process Clause guarantees that criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial. *Taylor v. Illinois*, 484 U.S. 400, 408 (1988).  A violation of this clause requires a showing that the petitioner was deprived of a witness whose testimony "would have been material, favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 873 (1982).

This claim borders on the frivolous. Neither Brown nor the sheriff in any way prevented Winkel from calling witnesses to testify on his behalf. In fact, Winkel called six witnesses to testify on his behalf at trial. Winkel claims that had he been able to contact them earlier, their testimony would have been more helpful as they would have remembered the facts that Winkel attempted to elicit. This argument, however, is conclusory. Additionally, the facts Winkel

attempted to present (*i.e.*, he would rather serve jail time than complete probation) appear marginally relevant and cumulative of his own testimony.

The only witness Winkel did not call to testify was the EMS worker, whom he claims would support his theory of defense that Gartleman did not suffer the injuries she claimed. The KCOA rejected Winkel's complaint that his court appointed attorney should have subpoenaed the EMS witness, stating "[Winkel] forgets he dismissed the attorney and severely limited what his attorney could do as standby counsel. Winkel chose to proceed pro se, and he now must abide by the consequences of his decision." *Winkel*, 322 P.3d 1026 at *4. That assessment was objectively reasonable. In any case, Winkel was able to use Dr. George's testimony to present that theory, thus the EMS witness's testimony would have been cumulative of Dr. George's. Under these circumstances, Winkel cannot show a violation of his right to compulsory process. Thus, Ground 7 does not provide a basis for federal habeas relief.

### F.  Exclusion of EMS Report as Hearsay (Ground 8)

In Ground 8, Winkel alleges that he was deprived of his right to present evidence to establish reasonable doubt because the trial court excluded an EMS report as inadmissible hearsay. "[S]tate evidentiary determinations ordinarily do not present federal constitutional issues." *Romano v. Gibson*, 239 F.3d 1156, 1166 (10th Cir. 2001). Additionally, a defendant does not have license to present any evidence he pleases. *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) ("[T]he accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."). Winkel made a tactical error when he assumed that Dr. George could set the foundation for the EMS report. Because Ground 8 relies exclusively on state law, it is not cognizable on federal habeas review. *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62,

67-68 (1991) (holding that habeas relief will not lie to correct errors in interpretation or application of state law).

### G. Sufficiency of the Evidence (Ground 9)

Ground 9 alleges the state presented insufficient evidence to support Winkel's conviction for aggravated kidnapping. Winkel argues he lacked the requisite intent to kidnap Gartleman or to inflict bodily injury or terrorize her. The KCOA rejected this argument. It found that the evidence, viewed in the light most favorable to the prosecution, warranted a conviction by a reasonable factfinder. It stated that "Winkel's act of headbutting Gartleman or pulling her back into the car when she attempted to flee is sufficient evidence of his specific intent to hold her with the intent to cause bodily harm or terrorize her." *Winkel*, 322 P.3d at *2.

The applicable constitutional standard for a sufficiency of evidence claim is whether upon the evidence produced at trial, any rational trier of fact could have found petitioner guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Matthews v. Workman*, 577 F.3d 1175, 1183 (10th Cir. 2009). The Supreme Court in *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith*, 132 S.Ct. 2, 3-4 (2011). To obtain federal habeas relief, it must be shown that a state court decision rejecting a sufficiency of the evidence claim was objectively unreasonable. *Id.* at 4.

Winkel asserts that Gartleman's statement that he threw her car into park while they were on the highway was not credible because there were no skid marks or transmission damage to the vehicle. Additionally, Gartleman's testimony that "[he] grabbed her by the throat, threw her in the back seat and choked her" was not credible because her injuries "repeatedly disappeared and reappeared." Dkt. 1, Habeas Petition at 24. But uncontradicted evidence shows that Gartleman's

injuries required four stitches and left a visible scar. Because the KCOA applied a legal standard consistent with *Jackson*, and applied it in an objectively reasonable manner, no habeas relief is warranted on this claim.

**IV.     Certificate of Appealability**

Because it plainly appears from the petition and attached exhibits that Winkel is not entitled to federal habeas relief, the court concludes that a certificate of appealability should not issue in this case.

**IT IS THEREFORE ORDERED** that Winkel's Petition for Habeas Relief (Dkt. 1) is DENIED.

**IT IS SO ORDERED** this 20th day of May 2016.


s/ J. Thomas Marten
J. THOMAS MARTEN, Judge